IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUTH BERLIN and ARTHUR BERLIN,<br>2316 Parallel Lane<br>Silver Spring, MD 20904<br><br>and<br><br>KATHRYN SQUIRES,<br>1428 Decatur Circle,<br>Franklin, TN<br><br>            Plaintiffs,<br><br>      v.<br><br>MERCK SHARP & DOHME CORP.,<br>126 East Lincoln Avenue<br>Rahway, NJ 07065-4646<br>   *with service on*<br>   CT Corporation System<br>   1015 Fifteenth Street, N.W.<br>   Suite 1000<br>   Washington, DC 20005<br><br>and<br><br>ROCHE LABORATORIES, INC.<br>340 Kingsland Street<br>Nutley, NJ 07110<br>   *with service on*<br>   The Corporation Trust Incorporated<br>   351 West Camden Street<br>   Baltimore, MD 21201<br><br>and<br><br>GLAXOSMITHKLINE LLC,<br>1105 North Market Street<br>Wilmington, DE 19801-1216<br>   *with service on*<br>   Corporation Service Company<br>   1090 Vermont Ave., N.W.<br>   Washington, DC 20005 | Civil Action No. |

1

]
Defendants.         ]

## FIRST AMENDED COMPLAINT
### (Products Liability – Fosamax/Alendronate and Boniva/Ibandronate; Punitive Damages)

### JURISDICTION

1. Jurisdiction is founded upon 28 U.S.C. § 1332.

2. The amount in controversy exceeds $75,000 exclusive of interest and costs.

3. Plaintiffs Ruth and Arthur Berlin are natural persons and domiciliaries of Maryland.

4. Plaintiff Kathryn Squires is a natural person and domiciliary of Tennessee.

5. Defendant Merck Sharp & Dohme Corp. ("Merck") is a Delaware corporation with headquarters in New Jersey.

6. Defendant Roche Laboratories, Inc. ("Roche") is a Delaware corporation with headquarters in New Jersey.

7. Defendant GlaxoSmithKline LLC ("GSK") is a Delaware limited liability corporation whose sole member is a Delaware-based holding company; alternately, GSK is a wholly owned subsidiary of a United Kingdom corporation with dual headquarters in Philadelphia, Pennsylvania, and London, England, U.K.

### GENERAL FACTUAL ALLEGATIONS

8. At all times relevant hereto, Merck is or was engaged in the business of developing, testing, manufacturing, distributing, licensing, labeling, and marketing, either directly or indirectly, the compound alendronate, sold by Merck under the trade name Fosamax® and Fosamax Plus D®.

9. At all times relevant hereto, GSK and Roche were engaged in the business of developing, testing, manufacturing, distributing, licensing, labeling, and marketing, either directly or indirectly, the compound ibandronate, then sold by GSK and Roche and currently sold by Roche and Genentech USA, Inc. under the trade name Boniva®.

10. Alendronate and ibandronate are part of a class of drugs called bisphosphonates, which are used to treat bone conditions such as osteopenia, osteoporosis, and Paget's disease. There are two classes of bisphosphonates: "N-containing," which are nitrogenous, and "non-N-containing," which are non-nitrogenous. Alendronate and zoledronic acid are nitrogenous bisphosphonates.

11. Merck first sold alendronate in 1995.

12. GSK and Roche first sold ibandronate in 2003.

13. The femur is considered one of the strongest bones in the body; even in individuals with bone durability problems, breaks in the femur are quite rare.

14. Prior to 2005, animal studies indicated that bisphosphonates could increase the risk of certain stress fractures over long-term use.

15. By 2004, Defendants knew or should have known that bisphosphonates, particularly alendronate, continue to have effects on bone after they are discontinued, from studies such as G. Strewler, "Decimal Point-Osteoporosis at the 10-Year Mark," 350 N.E.J.M. 1172 (2004).

16. As early as 2005, Defendants were or should have been aware from reports in the scientific literature that bisphosphonates reduce osteoclastic bone resorption, thereby increasing bone mineral density and decreasing bone turnover. Prolonged suppression of bone turnover by bisphosphonates allows accumulation of the

small cracks and other microdamage that occurs regularly in bone but would normally be repaired by the body.  This damage could create "increased susceptibility to nonspinal fractures that heal poorly."  C.V. Odvina, et al., "Severely suppressed bone turnover: a potential complication of alendronate therapy." 90 *J. Clin. Endocrinol. Metab.* 1294–1301 (2005).

17.     By 2006, case reports began appearing in the medical literature showing "unusual" femur fractures in individuals taking bisphosphonates.  *See*, *e.g.*, Jennifer Scheider, "Should Bisphosphonates be Continued Indefinitely? An Unusual Fracture in a Healthy Woman on Long-Term Alendronate," 61 *Geriatrics* 31-33 (2006).

18.     In 2008, an article in the British Medical Journal claimed that the benefit of bisphosphonates had been overstated by an emphasis on relative risk rather than absolute risk.  According to this study, bisphosphonates do not prevent as many fractures as they are made to seem; this article supports the 2006 ICARO study, which found that bisphosphonate treatment by doctors had a much lower rate of fracture prevention than in the clinical trials.  No Defendant re-evaluated the indications for their bisphosphonate products or their risk versus benefit in light of these articles.

19.     Until October of 2010, no Defendant made changes to their labeling, package inserts, prescribing information, or other warnings to include information regarding the risk of femur breakage from long-term use of their bisphosphonate products.

20.     Mid-shaft femoral fractures such as those suffered by Plaintiffs are of a type now considered "typical" by many medical professionals as caused by long-term exposure to alendronate.  *See, e.g.*, Sarah Shock Chan, et al., "Subtrochanteric Femoral

Fractures in Patients Receiving Long-Term Alendronate Therapy: Imaging Features," 194 *Am. J. Roentgoenology* 1581 (2010) (showing that alendronate-related femur fractures had distinctive X-ray images).

21.     In January of 2011, Defendants changed the labeling on their bisphosphonate products to include the risk of femur fracture.

## FACTS SPECIFIC TO PLAINTIFF RUTH BERLIN

22.     On or about the year 1999, Ruth Berlin was prescribed Fosamax® for osteoporosis by her physician.

23.     From 1999 until May of 2011, Ruth Berlin took Fosamax® as directed by her physician.

24.     Ruth Berlin filled the majority of her prescriptions with name-brand Fosamax® manufactured by Merck.

25.     On June 16, 2011, Ms. Berlin suffered a fracture of her right femur while engaged in normal movement.

26.     Ms. Berlin's fracture occurred in the shaft of the femur.

27.     Ms. Berlin's femur fracture was caused in whole or part by her use of Fosamax®.

## FACTS SPECIFIC TO PLAINTIFF KATHRYN SQUIRES

28.     In July of 2005, Kathryn Squires was prescribed Fosamax Plus D® for osteopenia by her physician.

29.     From July of 2005 until July of 2006, Kathryn Squires took Fosamax Plus D® as directed by her physician.

30. From July of 2006 to May 2009, Kathryn Squires was prescribed and took Boniva® for her osteoporosis, still as directed by her physician.

31. Kathryn filled all her prescriptions with name-brand Fosamax Plus D® manufactured by Merck or name-brand Boniva® manufactured by GSK and Roche.

32. On March 20, 2009, after four years of taking bisphosphonates, Ms. Squires suffered a fracture of her right femur while engaged in housework.

33. Ms. Squires's fracture occurred in the shaft of the femur.

34. Ms. Squires's femur fracture was caused in whole or part by her use of Defendants' bisphosphonate products Fosamax Plus D® and Boniva®.

## COUNT I
(Negligent Failure to Test)

35. All general factual allegations are re-alleged and incorporated by reference.

36. Given the scientific and other reports available regarding alendronate and other bisphosphonates, Defendants all had duties to engage in further tests to determine if their bisphosphonate products were safe and effective for long-term use.

37. Defendants did not conduct sufficient testing to determine the risks of bisphosphonates despite the clear markings in the scientific literature.

38. As a result of Merck's negligence, Ruth Berlin was exposed to Fosamax® and suffered injury and damages, including but not limited to: broken femur, surgery, incurred costs for medical treatment, pain and suffering, and loss of ability to engage in life activities.

39. As a result of Merck and GSK and Roche's negligence, Kathryn Squires was exposed to Fosamax Plus D® and Boniva® and suffered injury and damages,

including but not limited to: broken femur, surgery, lost wages, incurred costs for medical treatment, pain and suffering, and loss of ability to engage in life activities.

## COUNT II
### (Negligent Failure to Warn)

40.     All allegations stated in the previous count and all general factual allegations are re-alleged and incorporated by reference.

41.     Merck knew or should have known from independent scientific reports and other sources, including adverse event reports, that alendronate-containing products such as Fosamax®, had a significantly increased risk of femur fracture after long-term use.

42.     GSK and Roche knew or should have known from independent scientific reports and other sources, including adverse event reports, that bisphosphonates such as Boniva® had a significantly increased risk of femur fracture after long-term use.

43.     All Defendants failed to provide such information and/or warnings, and as a result, Plaintiffs were injured as aforesaid by the respective manufacturers of the products they ingested.

## COUNT III
### (Strict Liability)

44.     All allegations stated in the previous counts and all general factual allegations are re-alleged and incorporated by reference.

45.     Merck is engaged, or has been engaged, in the business of producing Fosamax®, and is, or has been, a commercial manufacturer of said drug.

46.     GSK and Roche are engaged, or were engaged, in the business of producing Boniva®, and is, or have been, commercial manufacturers of said drug.

47. Plaintiffs purchased, received, and ingested the bisphosphonates they were prescribed in the same condition as when they left the respective Defendant's possession.

48. Defendants knew, or should have known, that patients and their attending physicians could not realize and could not detect the dangerous and harmful nature of their bisphosphonate drugs. Clear warnings as to the risk of femoral fractures due to long term use should have been disseminated to overcome Defendants' promotions and advertising proclaiming the safety and efficacy of their respective bisphosphonate drugs.

49. As a result of Defendants' marketing and promotion of said defective and unreasonably dangerous drugs, Plaintiffs ingested bisphosphonates and suffered injury, loss, and damages as aforesaid.

50. By reason of having marketed and promoted thes drugs in thei defective and unreasonably dangerous condition, Defendants are strictly liable to Plaintiffs for their injuries, losses, and damages.

COUNT IV
(Breach of Warranty)

51. All allegations stated in the previous counts and all general factual allegations are re-alleged and incorporated by reference.

52. At all times relevant to this action, Defendants promoted their respective bisphosphonate drugs with express and implied warranties to both patients and their treating physicians as to the drugs' safety. These warranties appeared as advertisements, on websites, and in package inserts.

53. Defendants knew, or should have known, that patients and their physicians were relying on said express and implied warranties.

54. At all times relevant to this action, Defendants knew or should have known that bisphosphonates could create a risk of femoral fracture after long-term use. As such, Defendants' warranties were false, misleading, and unfounded.

55. As a result of Defendants' breach of these warranties, Plaintiffs were injured as aforesaid.

## COUNT VI
### (Misrepresentation)

56. All allegations stated in the previous counts and all general factual allegations are re-alleged and incorporated by reference.

57. Defendants promoted their bisphosphonate drugs as safe and effective for use despite knowledge of the potential for bone breakage after long-term use.

58. At no time did Defendants take any action to correct the impression that their bisphosphonate drugs were safe for long-term use.

59. Plaintiffs' physicians relied on Defendants' promotions in prescribing bisphosphonates to Plaintiffs.

60. As a result of Defendants' misrepresentations, Plaintiffs were injured as aforesaid.

## COUNT VII
### (Punitive Damages)

61. All allegations stated in the previous counts and all general factual allegations are re-alleged and incorporated by reference.

62. Defendants exercised substantial control over the design, testing, and labeling of their bisphosphonate drugs, and could have at any time conducted further or

made changes in the design or labeling under the "changes being effected" process or other means.

63. There was no alteration of the bisphosphonate drugs between the time of manufacture and the ingestion by Plaintiffs.

64. The acts of Defendants were gross, wanton and intentional in that Defendants, at the time of Plaintiffs' purchases and ingestion of bisphosphonates, had actual and constructive notice that alendronate and ibandronate could cause femur fractures after long-term use. Nonetheless, Defendants knowingly and intentionally promoted bisphosphonates as safe drugs, disregarding the published literature that warned of the risks and criticized its efficacy.

65. Defendants' gross, wanton, and intentional acts led, individually or in concert, to Plaintiffs' injuries as aforesaid.

## COUNT VIII
(Loss of Consortium)

66. Arthur Berlin is the husband of Ruth Berlin, and has been married to Ms. Berlin for all times relevant to this complaint.

67. As a result of Ms. Berlin's injuries caused by the negligence, strict liability, breach of warranty, and misrepresentation of Merck as aforesaid, Arthur Berlin has been deprived of the love, services, and affection of his wife.

**WHEREFORE**, Plaintiff Ruth Berlin demands judgment against Merck in the sum of Two Million Dollars ($2,000,000.00), as compensatory damages and the sum of Two Million Dollars ($2,000,000.00) as punitive damages, plus costs.

**WHEREFORE**, Plaintiff Arthur Berlin demands judgment against Merck in the sum of One Million Dollars ($1,000,000.00), as compensatory damages and the sum of One Million Dollars ($1,000,000.00) as punitive damages, plus costs.

**WHEREFORE**, Plaintiff Kathryn Squires demands judgment against Merck, GSK and Roche in the sum of Two Million Dollars ($2,000,000.00), as compensatory damages and the sum of Two Million Dollars ($2,000,000.00) as punitive damages, plus costs.

        Respectfully submitted,
        AARON M. LEVINE & ASSOCIATES

        _/s/ Aaron M. Levine_
        Aaron M. Levine, #7864
        1320 19th Street, N.W., Suite 500
        Washington, D.C. 20036
        Telephone: (202) 833-8040
        Facsimile: (202) 833-8046
        aaronlevinelaw@aol.com

        Counsel for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues of material fact.

        _/s/ Aaron M. Levine_
        Aaron M. Levine